## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JAY F. JOHNSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No.: 2:15-CV-01094-ACA** |
| | ) | |
| MARK T. ESPER, SECRETARY | ) | |
| OF THE UNITED STATES | ) | |
| DEPARTMENT OF ARMY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Jay F. Johnson, proceeding *pro se*, brings this employment action against Defendant Mark T. Esper, in his official capacity as the Secretary of the United States Department of Army, for alleged discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964. (Docs. 1 and 21).[1] The action is before the court on the Secretary's motion for summary judgment. (Doc. 44). The motion is fully briefed. (Docs. 45, 56, 57). For the reasons discussed below, the court finds that there is no dispute of genuine material fact, and the Secretary is entitled to judgment as a matter of law.

---

[1] Mr. Johnson originally named John M. McHugh, the former Secretary of the Army in his official capacity as the defendant in this action. (Doc. 21). On August 15, 2017, the court substituted Ryan D. McCarthy, the former Acting Secretary of the Army in place of Mr. McHugh. (Doc. 55). Mark T. Esper is now the Secretary of the Army. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), the court substitutes Secretary Esper for Mr. McCarthy as the defendant in this action, and the court directs the Clerk to make the change on the docket.

Therefore, the court **WILL GRANT** the Secretary's motion for summary judgment.

## I. BACKGROUND

### A. *The Secretary's Challenge to Mr. Johnson's Statement of Facts*

The Secretary argues that the court should deem his statement of undisputed facts admitted because Mr. Johnson did not follow Rule 56 or the court's Initial Order. (Doc. 57 at 4). Under Rule 56, a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). In keeping with that requirement, Appendix II to this court's Uniform Initial Order requires that, to show a genuine dispute of material fact, the non-moving party must provide "a specific reference to those portions of the evidentiary record upon which the dispute is based." (Doc. 51 at 16) (emphasis in original). The Order warns that "[a]ll material facts set forth in the [movant's] statement . . . will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (*Id.*) (emphasis in original omitted). A party's *pro se* status does not excuse failure to follow Rule 56 or the court's orders. *See Moon v. Newsome*, 863

F.2d 835, 837 (11th Cir. 1989) ("[O]nce a *pro se* [] litigant is in court, he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure.").

Here, the Court reminded Mr. Johnson of the requirements of Rule 56, including "his right to file affidavits or other materials in opposition to the [Secretary's] motion," and the court directed Mr. Johnson to the requirements of Appendix II. (Doc. 52). The court warned Mr. Johnson of the consequences of not complying with Rule 56, including that the Secretary's statement of facts may be deemed admitted, the motion for summary judgment may be granted, and judgement entered in the Secretary's favor. (*Id.* at 2). Nevertheless, Mr. Johnson generally failed to comply with Rule 56 and Appendix II by not "citing to particular parts of materials in the record" or by "showing that the materials cited [by the Secretary] do not establish the absence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1); *see also* Doc. 56. Consequently, the court does not consider Mr. Johnson's statement of facts that are not supported by any citations to the record, (*see* Doc. 56 at 5-32), and the court accepts the Secretary's statement of facts as undisputed. But, as it must in considering a motion for summary judgment, the court carefully examined the evidence cited by the Secretary and construes the facts in the light most favorable to Mr. Johnson, the non-movant. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012)

With his brief, Mr. Johnson submitted an unsworn statement from Ray Minter, his former supervisor. (Doc. 56 at 35-39). The court previously explained to Mr. Johnson that "[a]ffidavits must either be notarized or be subscribed as true under penalty of perjury." (Doc. 52 at 4). Thus, the court cannot and does not consider Mr. Minter's unsworn statement. *See Dudley v. City of Monroeville,* 446 F. App'x 2014, 2017 (11th Cir. 2011) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not—and properly did not—rely on the contents of the citizen's [unsworn] statement.") (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003)).

Against this background, the undisputed material facts, discussed below, demonstrate that summary judgment is appropriate.

### B.  *Undisputed Material Facts*

Mr. Johnson is employed by the Department of the Army as the Director of Emergency Services at the Anniston Army Depot. (Doc. 44-2 at 5; Doc. 44-8 at 4). In this role, Mr. Johnson oversees the Depot's law enforcement, security, and fire operations. (Doc. 44-8 at 4). His immediate supervisor is the Chief of Staff at the Army Depot. (Doc. 44-4 at 3). Until 2008, Ray Minter was Chief of Staff, and from 2008 to the present, Phil Trued has been the Chief of Staff. (Doc. 44-4 at 3).

Mr. Johnson's next level supervisor is the Depot Commander. (Doc. 44-4 at 3; Doc. 44-8 at 8). Col. Sherry Keller served as the Depot Commander from

August 2007 to August 2010. (Doc. 44-4 at 2).[2] Mr. Johnson, a Caucasian man, asserts that Col. Keller, an African-American woman, discriminated against him on the basis of his race and sex, subjected him to a hostile work environment on the basis of his race, and then retaliated against him when he complained of the discrimination and harassment. (Doc. 21).

According to Mr. Johnson, Col. Keller's discriminatory actions and harassment began in August 2007 when she became the Depot Commander and continued until she left the Army Depot in August 2010. (Doc. 21 at 2; Doc. 56 at 3). Mr. Johnson complains about a number of alleged discriminatory and retaliatory acts. (Doc. 24-1; Doc. 44-8 at 7). For the sake of clarity, the court will address the alleged discriminatory and retaliatory acts chronologically by category.

### *1.* *Alleged Discriminatory Acts*

#### *a.* *The July 2007 Letter of Instruction*

In July 2007, one month before Col. Keller became the Commander, Mr. Minter issued a Letter of Instruction ("LOI") regarding Mr. Johnson's role in handling traffic stops at the Army Depot. (Doc. 44-4 at 94-95). LOIs instruct Army employees about how an individual commander wants certain tasks to be carried out. (Doc. 44-4 at 12, 20). LOIs are not disciplinary in nature, and they are

---

[2] Col. Keller's legal name is now Sherry Bowler. (Doc. 44-4 at 2). At all times relevant to this case, her legal name was Sherry Keller. (*Id.*). Accordingly, the court refers to her as Col. Keller.

not placed in an employee's personnel file or any other permanent employment record. (*Id.* at 12; Doc. 44-2 at 30).

The LOI from Mr. Minter directed Mr. Johnson to call one of his employees to handle a traffic stop if he observed a traffic infraction. (Doc. 44-4 at 94-95). The purpose of the LOI was to remind Mr. Johnson that as a civilian employee, his job responsibilities include "policy guidance, oversight, and leadership in all areas of DES [Department of Emergency Services] operation," and that trained uniformed or investigator DES employees who report to Mr. Johnson should carry out all traffic stops on Depot property. (Doc. 44-4 at 94).

Col. Keller was not involved in issuing the LOI to Johnson. (*Id.* at 20; Doc. 44-2 at 29-30). Even so, sometime in the fall of 2007, a TACOM[3] employee told Col. Keller that the LOI unreasonably restricted Mr. Johnson's authority. (Doc. 44-4 at 20; Doc. 44-2 at 29-30). Col. Keller did not rescind the LOI because it was issued during the previous command, and LOIs are not presumed to remain in effect after a change of command. (*Id.* at 20). According to Col. Keller, she did not believe she needed to address the LOI after her discussion with the TACOM employee because she had already implemented her own procedures, and Mr. Minter told her that no action needed to be taken. (*Id.*). Indeed, at the

---

[3] TACOM is the U.S. Army Tank-automotive & Armaments Command located in Warren, Michigan, and it is a higher command than the Army Depot. (Doc. 45 at 8, n.1). The TACOM employee was not in Col. Keller's chain of command. (Doc. 44-4 at 20).

administrative proceedings, Mr. Minter testified that he did not believe that Col. Keller needed to take any further action on the LOI. (Doc. 44-2 at 30).

### b. *The change in command and changes in procedures*

When Col. Keller assumed command of the Army Depot in August 2007, she adjusted certain policies and procedures to reflect her preferences and to update or modernize the operations at the Depot. (Doc. 44-4 at 6). Mr. Johnson contends that some of the changes Col. Keller implemented at DES were directed towards him and discriminatory in nature.

### i. *Change in Badge Denial Procedures*

According to Mr. Johnson, he had final authority to deny access, or deny a badge, to the Army Depot before Col. Keller became the Commander, but he concedes that the Commander could override his decision to deny a badge on a case by case basis. (Doc. 44-8 at 11; Doc. 44-2 at 6). In September 2007, a former contractor at the Army Depot, who had applied for a new position at the Depot, contacted Col. Keller to challenge Mr. Johnson's decision to deny him a badge. (Doc. 44-4 at 4; Doc. 44-2 at 6). Col. Keller then contacted Mr. Johnson to request a briefing on access control procedures at the Depot, including the policies and standards for denying access or a badge. (Doc. 44-4 at 4-5).

After the briefing, Col. Keller decided that Mr. Johnson would send any badge denial decision to the Depot's legal department for a recommendation, and

then send the decision and recommendation to her for final approval. (*Id.* at 5; Doc. 44-2 at 7; Doc. 44-8 at 13). Col. Keller made the change to ensure that badge denial decisions were not arbitrary and to protect the Depot from legal challenges to badge denials. (Doc. 44-4 at 5). The change did not impact Mr. Johnson's authority regarding badge denial decisions because he remained responsible for initial decisions regarding all badge denials, and his decision would remain in place unless Col. Keller reversed it. (*See* Doc. 44-4 at 5; Doc. 44-8 at 11). After she instituted the change, Col. Keller did not override any of Mr. Johnson's badge denial decisions. (Doc. 44-8 at 13).

### ii.      Change in Procedure Regarding the Military Police Blotter

In October 2007, Col. Keller also reviewed the procedures regarding the distribution of the military police desk blotter, a "daily report of noteworthy events and operations that impacted Depot operations and security . . . ." (Doc. 44-4 at 6-7; Doc. 56 at 114-15). Col. Keller requested that the key portions of the blotter she needed to see be copied from the blotter into a "broader daily report" prepared by members of her staff. (Doc. 44-4 at 6-7; Doc. 56 at 113). Mr. Johnson objected to the change because he believed it was contrary to the applicable regulations regarding distribution of the blotter, and he told Col. Keller that the regulations prohibited him from giving the blotter to Sgt. Major Gregory Williams. (Doc. 44-4 at 7-8; Doc. 56 at 103-07, 115). According to Mr. Johnson, when he informed Col.

Keller during a meeting that he could not comply with her request based on the regulations, Sgt. Major Williams and Col. Keller shouted "wrong answer" and became so confrontational that Mr. Johnson asked his subordinates to leave the meeting. (Doc. 44-2 at 8; Doc. 44-8 at 19). Ultimately, Col. Keller withdrew her request to have her staff extract information from the blotter for her, and she asked that the blotter be delivered to her office in a sealed envelope instead of by fax. (Doc. 44-4 at 8; Doc. 44-8 at 17). That change did not impact Mr. Johnson's responsibilities over the blotter. (Doc. 44-4 at 8; Doc. 44-8 at 19).

### c. Investigations, Meetings, and LOIs Relating to Department of Emergency Services ("DES")Issues

#### i. Morale Surveys and Sensing Sessions

Soon after Col. Keller assumed command of the Army Depot, the TACOM Inspector General ("IG") informed her of some complaints from DES employees and that he was in the process of setting up a "sensing session," or morale survey for the employees. (Doc. 44-4 at 3-4, 9). The IG sent the survey to DES employees in October 2007. (*Id.* at 28). Col. Keller did not make the decision to issue the survey, and the IG did not consult her about the questions to include in the survey. (*Id.* at 9). Based on the survey results, the IG found "significant climate concerns" at DES and recommended following up with focused feedback sessions and developing a strategy to address major concerns, including by forming a climate focus group for DES. (*Id.* at 10, 41). To address the IG's

recommendations, Col. Keller considered implementing a "communications forum" to give DES employees an opportunity to be heard on a variety of issues, and she sent an email to Depot employees, including Mr. Johnson, asking for feedback on the idea. (Doc. 44-4 at 10, 43). Col. Keller decided not to conduct the communications forum, and instead, she held an in-person "sensing session" with DES employees in early 2008. (*Id.* at 10-11).

### ii. The 15-6 Investigations

In addition, shortly before Col. Keller became Commander at the Army Depot, the previous Commander initiated an investigation into the Depot's fire department, and DES was the subject of a union allegation related to an employee's suicide. (Doc. 44-4 at 3-4; Doc. 44-8 at 56). The resulting investigation under Army Regulation 15-6 did not begin until after Col. Keller became Commander at the Depot. (Doc. 44-8 at 56; Doc. 44-4 at 12-13, 64). Col. Keller appointed Darrell Brewer to lead the investigation. (Doc. 44-4 at 13). Col. Keller initiated a second "15-6 investigation" of DES in January 2008 after receiving a directive to do so from TACOM. (*Id.* at 12; *see also* doc. 15 at 62-63). Specifically, TACOM directed Col. Keller to investigate issues identified through IG complaints and the IG's morale survey, including issues related to Mr. Johnson's distribution of overtime hours. (Doc. 44-4 at 12; Doc. 15 at 62-63).

Col. Keller appointed Emma Wilson to lead that investigation. (Doc. 44-4 at 12, 53, 58).

Col. Keller did not direct the 15-6 investigations, but she accepted the findings and recommendations from the investigations because she believed that Mr. Brewer and Ms. Wilson complied with Army Regulation 15-6, which requires that "the investigating officer must 'ascertain and consider the evidence on all sides of an issue' and 'be thorough and impartial.'" (*Id.* at 13, 79). TACOM also reviewed the scope and findings of the investigations, and requested updates from Col. Keller on actions taken to address issues identified in the investigations. (*Id.* at 13).

### iii.     *Meetings about Employee Concerns*

In late January 2008, Col. Keller received a letter from LaToya Colston-Jackson, a DES employee, about issues related to a requested job transfer and her shifts at the Army Depot. (Doc. 44-4 at 85-87). Ms. Colston-Jackson alleged that she had been asking Mr. Johnson for help for more than a year without any results. (*Id.* at 87). Col. Keller approached Mr. Johnson about the situation to use it as a specific example of the type of issues raised in the sensing sessions. (*Id.* at 15). During a meeting between Col. Keller, Mr. Johnson, and Ms. Colston-Jackson to address the issue, Col. Keller accused Mr. Johnson of showing "poor leadership." (Doc. 44-8 at 20-21). According to Mr. Johnson, he had been working to

accommodate Ms. Colston-Jackson's needs and concerns, and Col. Keller was not interested in hearing his side of the story. (*Id.* at 21-22). Col. Keller allowed Mr. Johnson to address the situation, and the issue did not have any impact on Mr. Johnson's employment. (*Id.* at 21; Doc. 44-4 at 15).

Another DES employee, Angela Ellis, asked to transfer to the badge office. (Doc. 44-8 at 22). Mr. Johnson told Ms. Ellis's supervisor that he would talk with her about it. (*Id.*). But, Ms. Ellis went to Col. Keller about the transfer issue without speaking to Mr. Johnson first or giving Mr. Johnson a chance to address the issue. (Doc. 44-8 at 22). In February 2008, Col. Keller met with Mr. Johnson about Ms. Ellis's concerns, and she told him that the situation with Ms. Ellis was another example of his poor leadership. (Doc. 44-8 at 22-23). Col. Keller asserts that, as with the situation regarding Ms. Colston-Jackson, she met with Mr. Johnson about Ms. Ellis's complaints to use it as a learning opportunity for Mr. Johnson, and she allowed Mr. Johnson to handle Ms. Ellis's complaints. (Doc. 44-4 at 15). Mr. Johnson experienced no repercussions with respect to Ms. Ellis's complaints, and Col. Keller did not follow-up with Mr. Johnson after they discussed the complaints. (*Id.*).

<u>iv.</u>      *The February 2008 LOI*

Based on the feedback from Col. Keller's sensing session and the IG's morale survey, Col. Keller asked Mr. Minter to issue a February 28, 2008 LOI to

Mr. Johnson.  (Doc. 44-4 at 11, 46-50).  The LOI instructed Mr. Johnson to begin and end his shifts at the Army Depot one hour earlier than he had before, or by 6:00 a.m. and 3:30 p.m., respectively.  (*Id.* at 50).  Col. Keller made the change to Mr. Johnson's shift so that Mr. Johnson would be more accessible to DES employees during the morning shift changes, and to address the recommendation that "DES Leadership makes their presence felt [] [during] shift changes."  (Doc. 44-4 at 11, 61; Doc. 44-8 at 49).  According to Mr. Johnson, Col. Keller required him to report to work an hour earlier to harass him because she knew that his wife needed his help at home during early morning hours.  (Doc. 56 at 14-15).

*v.*     *The March 2008 LOI*

Col. Keller issued another LOI to Mr. Johnson in March 2008 based on the findings from the 15-6 investigations.  (Doc. 44-4 at 79-83).  In the letter, Col. Keller stated that the investigation findings reflected "very poorly on [Mr. Johnson's] interpersonal, communication, and leadership skills . . . ."  (*Id.* at 79). The LOI addressed recommendations from the 15-6 investigations and, among other things, it instructed Mr. Johnson to implement an overtime plan "so that more equitable distribution of overtime will occur."  (Doc. 44-4 at 14, 60, 80; *see also* Doc. 15 at 62-63). The LOI further instructed that when Mr. Johnson requests overtime for himself, he should "provide, in writing, specific reasons why overtime should be granted," and Mr. Minter, or, in Mr. Minter's absence, Col. Keller,

would consider the request and other DES employees "should perform the proposed tasks before [Mr. Johnson's] request is acted upon." (Doc. 44-4 at 14, 82). Col. Keller states that she took that action to remedy perceived inequities in overtime approvals. (*Id.* at 14). The LOI did not prohibit Mr. Johnson from working overtime, and he continued to work overtime after Col. Keller issued the LOI. (*Id.* at 79-83; Doc. 44-9 (identifying paid overtime hours for Johnson since March 2008)).

*d.*     *December 2008 Suspicious Call and Memorandum of Concern*

In December 2008, an employee at the Army Depot received a suspicious call from a person requesting the building plans and layouts of the Depot's Child Development Center. (Doc. 44-4 at 21; Doc. 44-5 at 4). Mr. Johnson had a conference call with Col. Keller, Mr. Trued, and George Worman, the Depot's legal counsel, about the suspicious call, and Mr. Johnson informed Col. Keller that he intended to contact the FBI to report the call. (Doc. 44-4 at 21; Doc. 44-5 at 4; Doc. 44-7 at 5). Col. Keller directed Mr. Johnson to contact the Army Criminal Investigation Command instead, and he agreed to do so. (Doc. 44-4 at 21; Doc. 44-5 at 4). After the incident was resolved, Mr. Johnson informed Mr. Trued and Mr. Worman that he believed Col. Keller's directive violated applicable

regulations about reporting requirements, but Mr. Johnson did not mention his concerns during the conference call. (Doc. 44-5 at 5; Doc. 44-7 at 5).[4]

Col. Keller felt that Mr. Johnson's failure to inform her of his concerns "was a serious breach in his duties" to candidly advise the Commander and, consequently, she issued a Memorandum of Concern ("MOC") to Mr. Johnson on December 8, 2008. (Doc. 44-4 at 22, 97-98). The MOC states in part that Col. Keller "expect[s] to be advised in advance if [Mr. Johnson] believe[s] any course of action [she] undertake[s] is in violation of regulation," but the MOC did not have any impact on Mr. Johnson's employment, and it was not placed in his personnel file. (*Id.* at 23, 97).

<u>*e.* *Training Issues*</u>

Mr. Johnson asserts that Col. Keller further discriminated against him by harassing him about training schedules in an attempt to divert his attention away from a major chemical weapons inspections. (Doc. 24-1 at 2). Col. Keller asked Mr. Minter to contact Mr. Johnson about his training or inspection schedule in response to requests for the information from TACOM, and she contends that she did not make any such requests with a short turnaround time. (Doc. 44-4 at 23-24). In addition, Mr. Johnson admits that he was not required to attend training during the chemical weapons inspection period. (Doc. 44-8 at 53).

---

[4] Mr. Johnson asserts that Col. Keller's order to contact the Criminal Investigation Command instead of the FBI was also a retaliatory act. (Doc. 24-1 at 3).

2.    *Alleged Retaliatory Acts*

Mr. Johnson initially contacted the Army's Equal Employment Opportunity ("EEO") Office about Col. Keller's alleged discrimination and harassment on March 5, 2008. (Doc. 44-1 at 2). Col. Keller learned of Mr. Johnson's complaints shortly thereafter, and Mr. Johnson contends that Col. Keller retaliated against him for reporting the alleged discrimination and harassment to the EEO Office. (Doc. 24-1 at 3).

a.    *Col. Keller's Statements about EEO Claims*

In May 2008, Col. Keller stated at a budgeting meeting, which Mr. Johnson attended, that the Army would not settle with individuals who file EEO claims. (Doc. 44-4 at 20). Mr. Johnson contends that Col. Keller also stated that the Army Depot "will make it as difficult on them as they make it on us," and that she looked directly at him when she made the comments. (Doc. 24-1 at 3; Doc. 44-8 at 35). According to Col. Keller, she made the comments with respect to certain "alleged harassers who had requested settlements in exchange for leaving their employment" at the Depot, and she was not referring to Mr. Johnson's claims. (Doc. 44-4 at 20-21).

b.    *Deduction of Overtime from Mr. Johnson's Pay*

Also in May 2008, approximately $1,300 was deducted from Mr. Johnson's paycheck, which corresponds to 25.5 hours of overtime paid to Mr. Johnson in

March 2008. (Doc. 44-9 at 6; Doc. 44-8 at 34). Mr. Johnson testified that Mr. Minter had approved Mr. Johnson's overtime, and he contends that Col. Keller wrongfully removed it from his pay in retaliation for his complaints. (Doc. 44-8 at 34; Doc. 44-3 at 37-40). Col. Keller states that she did not advise or direct CPAC to remove the overtime pay from Mr. Johnson's paycheck. (Doc. 44-4 at 24; Doc. 44-3 at 41). Col. Keller also testified that she did not have knowledge about the overtime issue when it occurred, and Mr. Johnson admits that he never reported the issue to Col. Keller. (Doc. 44-3 at 40-41).

### c. DES Reorganization and Reclassification of Mr. Johnson's Position

One recommendation from the 15-6 investigations was to "[r]eorganize the DES so operations report to and are answerable to the Deputy [Director of] DES." (Doc. 44-4 at 60). In the summer and fall of 2008, Mr. Minter worked with DES leadership to implement that recommendation, and realigning job descriptions with job duties was one aspect of the DES reorganization. (*See id.* at 16-17; Doc. 44-3 at 73).

In June 2008, while the reorganization efforts were ongoing, Col. Keller met with Gary Burt, Mr. Johnson's second-in-command at DES, to discuss an upcoming inspection, but, during the meeting, Col. Keller also asked Mr. Burt about the DES reorganization. (Doc. 44-3 at 75; Doc. 44-4 at 18). According to Mr. Johnson, Col. Keller held the meeting on his off day to ensure that he could

not attend and in retaliation for his complaints of discrimination. (Doc. 24-1 at 3). However, Mr. Burt, rather than Col. Keller set the date for the meeting. (Doc. 44-3 at 58-59, 75; Doc. 44-4 at 18-19). Moreover, Col. Keller did not make any decisions regarding the reorganization at the meeting, and Mr. Johnson attended other substantive meetings about the reorganization. (Doc. 44-3 at 73; Doc. 44-4 at 19).

As part of the effort to reorganize DES, Mr. Burt worked with the Civilian Personnel Advisory Center ("CPAC") to revise the written position description for his new position of Deputy Director of DES. (Doc. 44-3 at 66-67). During that process, Mr. Burt discovered that descriptions for the positions of Deputy Director and Director of DES already existed in FASCLASS, the Army's Fully Automated System for Classification. (Doc. 44-3 at 66-67; *see also* Doc. 15-1 at 14). FASCLASS classified the positions as GS-0301, or General Administration and Program Series positions, rather than GS-0080, or Security Administration Series positions, as the Depot had classified Mr. Johnson's director position. (*Id.*).

CPAC confirmed that Mr. Johnson's position should be reclassified to a GS-0301 position because the Depot's fire department had been added as a division of DES in 2005. (Doc. 44-6 at 4). Accordingly, CPAC updated Mr. Johnson's written position description on October 9, 2008 to reflect the new classification. (*Id.*). Col. Keller approved the reclassification, but she did not initiate the action to

reclassify Mr. Johnson's position or order the reclassification.  (Doc. 44-4 at 17; Doc. 44-6 at 4).

<u>d.</u>     *Removal of Johnson's Annual Leave*

Mr. Johnson lost 344 hours of annual leave between January 2007 and January 2009, which he asserts was in retaliation for his EEO claims.  (Doc. 24-1 at 3; Doc. 44-8 at 47).  Mr. Johnson lost the leave pursuant to a federal "use-it-or-lose-it" leave policy, which caps the amount of leave an employee may carry from one year to the next.  (Doc. 44-8 at 47-48).  Col. Keller is not responsible for interpreting or applying the "use-it-or-lose-it" policy or changes to the policy. (Doc. 44-4 at 24).

<u>e.</u>     *Changes to Johnson's Performance Rating*

A February 2009 memorandum reflects that based on the IG's sensing sessions and the 15-6 investigations, Mr. Johnson's performance rating for February to September, 2008 received a (-1) point deduction for "leadership." (Doc. 15-1 at 41).  This moved Mr. Johnson's average score from a 3 to a 2.7.  (*Id.* at 39, 53).  Mr. Johnson appealed the deduction, but Col. Keller ultimately denied his appeal due to the issues identified by the IG and in the sensing sessions which took place during the rating period.  (*Id.* at 37-39, 41).

*Johnson's EEO Claims*

As mentioned, Mr. Johnson initially contacted the Army's EEO Office about his complaints in March 2008.  (Doc. 44-1 at 2).  He received a right to file letter from the EEO office on April 2, 2008, and he submitted an EEO complaint on April 13, 2008.  (*Id.*).  Mr. Johnson amended his EEO complaint on September 19, 2008 and December 9, 2008.  (*Id.* at 7, 10).  The Army investigated Mr. Johnson's complaint and held fact-finding conferences on September 9, 2008 and December 1, 2008.  (Doc. 44-2 at 2; Doc. 44-3 at 2).

This action followed.  In his third amended complaint, Mr. Johnson asserts the following claims against the Secretary: (1) sex-based and race-based discrimination in violation Title VII; (2) race-based hostile work environment in violation of Title VII; and (3) retaliation in violation of Title VII.  (Doc. 21).

## II.   ANALYSIS

The Secretary moves for summary judgment on all of Mr. Johnson's claims, arguing that Mr. Johnson has failed to establish a prima facie case or demonstrate pretext.  (Doc. 45 at 33-72).[5]  In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law.

---

[5] The Secretary also argues that Mr. Johnson failed to exhaust administrative remedies with respect to certain of his claims.  (Doc. 45 at 26-33).  As explained below, all of Mr. Johnson's claims fail on the merits.  Therefore, the court does not consider the substance of the Secretary's exhaustion argument.

Fed. R. Civ. P. 56(a).  A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.  *Mr. Johnson's Discrimination Claims*

The Secretary argues he is entitled to summary judgment on Mr. Johnson's race and sex discrimination claims[6] because Mr. Johnson has not submitted evidence creating triable issues of material facts with respect to his claims.  (Doc. 45 at 33-58).

A plaintiff may establish his Title VII discrimination claims "through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta*, 520 F. 3d 1269, 1274 (11th Cir. 2008).  Mr. Johnson argues that Mr. Minter's statement that "Mr. Johnson was discriminated against because of his sex and race" is direct evidence of discrimination.  (Doc. 56 at 33).  As an initial matter, the court does not consider Mr. Minter's statement because it is unsworn. *See supra* p. 4.  Moreover, Mr. Minter's opinion is not direct evidence of intentional discrimination.   "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any

---

[6] Only two of the alleged discriminatory acts (the meetings involving Ms. Colston-Jackson and Ms. Ellis) are sex-related.  The remaining allegations of discriminatory treatment are strictly race-based.  (Doc. 44-8 at 25).

inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [basis of a protected classification]' are direct evidence of discrimination." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (citation omitted). The record contains no such statements from a decision-maker, and Mr. Johnson admitted that Col. Keller "never made comments about race or sex." (Doc. 44-8 at 22). Thus, Mr. Johnson has not submitted direct evidence of discrimination. In addition, Mr. Johnson has not presented statistical evidence of discrimination. Therefore, Mr. Johnson must rely on circumstantial evidence.

Because Mr. Johnson relies on circumstantial evidence to establish his discrimination claim, the court evaluates the claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case by presenting evidence that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside of his protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275. If the employer satisfies this light burden then the burden shifts back to the plaintiff to prove the employer's "proffered reason really is a pretext for unlawful discrimination." *Id.* (internal quotation marks and citations omitted).

The Secretary argues that he is entitled to summary judgment on Mr. Johnson's discrimination claims because Mr. Johnson cannot establish prima facie case. Specifically, the Secretary contends that none of the alleged discriminatory acts are adverse employment actions, and Mr. Johnson cannot show that Col. Keller treated any similarly-situated non-Caucasian, female directors more favorably than she did Mr. Johnson. (Doc. 45 at 34-49).

To qualify as an adverse employment action for purposes of a discrimination claim, the action "must in some substantial way alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or

privileges of employment.") (emphasis in original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239 (citation omitted).

Turning to the specifics here, the court finds that none of the purportedly discriminatory acts rise to the level of an adverse employment action. First, Col. Keller's failure to rescind the 2007 LOI is not an adverse employment action. LOIs instruct employees how individual Commanders wish for certain procedures to be implemented. (Doc. 44-2 at 50; Doc. 44-4 at 12). They are not placed in employee personnel files or permanent records. (Doc. 44-2 at 30). Col. Keller did not rescind the 2007 LOI because incoming commanders generally are not privy to LOI's issued by previous commanders, and LOIs generally do not remain in effect after a change in command. (Doc. 44-4 at 20; Doc. 44-8 at 28). To the extent any portion of the 2007 LOI remained in effect, it instructed Mr. Johnson not to personally make traffic stops and to focus his attention on policy, oversight, and leadership of his department. (Doc. 44-4 at 94-95). Thus, the LOI did not result in a significant loss of the responsibilities associated with his position. *See Davis*, 245 F.3d at 1244 ("[A]pplying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement

with his employer's reassignment of job tasks" because "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise.").

The procedural change regarding badge denial decisions also fails to qualify as an adverse employment action. The undisputed facts demonstrate that a Commander always retained authority to review and reverse all decisions to grant or deny badge access to the Depot. (Doc. 44-4 at 5). Mr. Johnson remained the final recommending official on all badge denials, and Col. Keller never reversed his recommendations. (Doc. 44-8 at 13). Because the updates to badge denial procedure did not impact Mr. Johnson's tasks or responsibilities, the change in policy did not alter the terms and conditions of Mr. Johnson's employment.

The outcome of the fall 2007 meetings regarding the handling of the police blotter did not result in a material change to the terms and conditions of Mr. Johnson's employment. When Mr. Johnson answered questions about the limited distribution of the blotter, he was told "wrong answer." (Doc. 44-8 at 19). However, the evidence shows that following this meeting, Mr. Johnson continued to deliver blotter information directly to Col. Keller, and Mr. Johnson admits that his responsibilities remained unchanged. (Doc. 44-4 at 8; Doc. 44-8 at 19).

The 15-6 investigations were not directed specifically to Mr. Johnson, but rather addressed issues at DES as a whole. (*See* Doc. 44-4 at 53-77). In addition, nothing in the record indicates that the investigations had an impact of Mr.

Johnson's pay, duties, or employment opportunities, and Mr. Johnson has not presented evidence suggesting that the investigations caused a serious and material change in the terms, conditions, and privileges of his employment. (*See* Doc. 56).

The LOIs issued to Mr. Johnson as a result of the 15-6 investigations did not have a material impact on the terms, conditions, and privileges of his employment, and they were not even placed in his personnel file. Although the February 2008 LOI required Mr. Johnson to report to work an hour earlier, it did not require Mr. Johnson to work additional hours or impact his duties or pay. (Doc. 44-4 at 46-50). The March 2008 LOI changed the procedure that Mr. Johnson had to use to seek overtime, but it did not forbid or prevent Johnson from working overtime, or otherwise impact Johnson's job duties and pay. (Doc. 44-4 at 53-61). Indeed, Mr. Johnson's time records reflect that he continued to work overtime and earn overtime pay after March 2008. (Doc. 44-9). As a result, the LOIs do not qualify as adverse employment actions.

Next, three of the acts that Johnson complains of—the January and February 2008 meetings regarding Ms. Colston-Jackson and Ms. Ellis and the December 2008 MOC—are nothing more than meetings with, or a letter from, Col. Keller about Johnson's perceived performance issues. The MOC was simply a "counseling memorandum expressing concern and criticism . . . over one aspect of [Mr. Johnson's] [] performance." *Davis*, 245 F.3d at 1240. And, Mr. Johnson has

not presented any evidence that the meetings or the MOC had any adverse effect on the terms or conditions of his employment. (*See* Doc. 56); *see also Davis*, 245 F.3d at 1242 (finding that a "job performance memoranda" that expressed concern and criticism of an employee's performance was not an adverse employment action). Thus, Mr. Johnson's meetings with Col. Keller regarding Ms. Colston-Jackson and Ms. Ellis and the December 2008 MOC from Col. Keller are not adverse employment actions.

The same is true with respect to the February 2008 email from Col. Keller about the proposed communications forum and the August 2008 emails requesting information about Mr. Johnson's training schedules during a chemical weapons inspection. Mr. Johnson has presented no evidence explaining how Col. Keller's email soliciting input about a proposed DES communications forum that ultimately did not take place adversely impacted the terms and conditions of his employment. The email was not critical of Mr. Johnson and explained that the proposed forum would not "replace standard chain of command." (Doc. 44-4 at 10, 43-44). The record contains no evidence that Mr. Johnson faced repercussions as a result of the February 2008 email because the forum was never publicized or implemented. Likewise, the record contains no evidence that the August 2008 email altered Mr. Johnson's employment in any way. Mr. Johnson alleges that he was instructed not

to attend assigned leadership trainings during a seven month period, but he acknowledges that he was not required to attend training during that time frame.

In sum, none of the alleged discriminatory acts were adverse employment actions for purposes of a Title VII discrimination claim. Even if they were, Mr. Johnson has not presented evidence demonstrating that the Secretary treated him less favorably than similarly-situated non-Caucasian females. The plaintiff and an employee he identifies as a comparator "must be similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Mr. Johnson has pointed to no non-Caucasian female director who Col. Keller treated more favorably than she did Mr. Johnson. (*See generally* Doc. 56). Accordingly, Mr. Johnson cannot establish a prima facie case of race or sex discrimination.[7]

In the absence of any comparator, Mr. Johnson's claim would proceed to trial if he presented a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks and citation omitted). However, Mr. Johnson has not identified, and the court has not located, a convincing mosaic of circumstantial evidence from

---

[7] Because the court finds that Mr. Johnson has not established a prima facie case of race or sex discrimination, the court does not consider the Secretary's alternative argument that Mr. Johnson has failed to demonstrate pretext. *See Langford v. Magnolia Advanced Materials, Inc.*, 709 F. App'x 639, 643 (11th Cir. 2017) ("[B]ecause [plaintiff] did not establish a prima facie case, it is irrelevant whether he established pretext.") (*Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)).

which a reasonable jury could conclude that Col. Keller treated Mr. Johnson differently because of his race or sex. Therefore, the Secretary is entitled to judgment as a matter of law on Mr. Johnson's race and sex discrimination claims.

### C. *Johnson's Hostile Work Environment Claims*

To establish a hostile work environment claim based on race, a plaintiff must prove:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014). Mr. Johnson bases his hostile work environment claim on the same discrete acts that he submitted in support of his discrimination and retaliation claims. (*See* Doc. 44-8 at 7). The Secretary argues that Mr. Johnson has failed to establish that the alleged harassment he experienced was based on his race. (Doc. 45 at 60). The court agrees.[8]

Mr. Johnson concedes that Col. Keller made no remarks about his race. (Doc. 44-8 at 22). All of the actions that Col. Keller took relative to Mr. Johnson

---

[8] Because Mr. Johnson has not established that any harassment was based on his race, the court does not consider the Secretary's alternative argument that the harassment was not severe or pervasive enough to alter the terms and conditions of Mr. Johnson's employment. (*See* Doc. 45 at 58-60).

are facially neutral, and nothing about any of the actions would permit a reasonable juror to infer that they were race-based. The court acknowledges that Mr. Johnson believes that he was treated unfairly, but the evidence does not demonstrate that the treatment was based on his race. Therefore, the Secretary is entitled to judgment as a matter of law on Mr. Johnson's hostile work environment claim.

### C. *Johnson's Retaliation Claims*

Absent direct evidence, the *McDonnell Douglas* burden-shifting analysis applies to retaliation claims. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).[9] To establish a claim for Title VII retaliation, a plaintiff must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. *Furcron*, 843 F.3d at 1310. If the employer does this, the burden then shifts back to the plaintiff to show that the employer's proffered reasons are really pretext for retaliation. *Id.* at 1310-11.

The Secretary argues that Mr. Johnson cannot establish a prima facie case of retaliation under Title VII because some of the alleged retaliatory acts are not

---

[9] Mr. Johnson does not argue that he produced direct evidence of retaliation. (*See generally* Doc. 56).

adverse employment actions and because Mr. Johnson cannot demonstrate a causal connection with respect to others. The Secretary also argues that Mr. Johnson cannot establish that any of its legitimate, non-retaliatory reasons for the adverse actions are pretext for unlawful retaliation. (Doc. 45 at 60-72).

To establish a materially adverse action for purposes of a retaliation claim, a plaintiff must show that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). For purposes of summary judgment, the court assumes that the alleged retaliatory acts about which Mr. Johnson complains would dissuade a reasonable employee from making a complaint through the EEO process. However, Mr. Johnson's retaliation claims fail because he cannot show a causal connection between his EEO complaint and any adverse action or pretext.

To establish a causal connection, a plaintiff must demonstrate "that the decision-makers were aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (internal quotation marks and alterations omitted). A plaintiff can show a causal connection "by showing close temporal proximity between the statutorily protected activity and the adverse employment action[, . . . b]ut mere temporal proximity, without more,

must be 'very close.'"  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal citation omitted)).  For all but one of the alleged retaliatory acts, the record contains no evidence of a causal connection between Mr. Johnson's EEO complaint and the adverse action because Col. Keller was not involved in the action or because the action lacks temporal proximity to the March 2008 EEO complaint.

First, with respect to the removal of $1200.00 of overtime from Mr. Johnson's paycheck in May 2008, the undisputed evidence in the record establishes that Col. Keller was not responsible for deducting the money from Mr. Johnson's paycheck, and she was not aware that it had been done.  (Doc. 44-3 at 157-58; 44-4 at ¶ 78; Doc. 44-4 at 24; Doc. 44-3 at 41).

Second, the evidence is undisputed that Mr. Burt, not Col. Keller, was responsible for setting the date of the June 2008 briefing to discuss an upcoming inspection, and Col. Keller "did not have any input into the date."  (Doc. 44-4 at 18; see Doc. 44-3 at 58-59).  Therefore, Mr. Johnson cannot establish that Col. Keller retaliated against him by scheduling a meeting that she did not set.

Third, Mr. Johnson has not shown that Col. Keller was responsible for his loss of leave under the "use-or-lose" cap.  The undisputed evidence is that Col. Keller has no involvement in application of the "use-or-lose" policy.  (Doc. 44-4 at

24).  Therefore, Mr. Johnson has not demonstrated how Col. Keller could have retaliated against him by forcing him to forgo leave under a policy that she did not administer or control.

Fourth, the October 2008 reclassification of Mr. Johnson's position, Col. Keller's December 2008 order to Mr. Johnson to contact the Criminal Investigation Command instead of the FBI concerning the suspicious call, and the performance rating change in February 2009 lack a temporal relationship to Mr. Johnson's EEO activity because these events occurred six months, eight months, and eleven months after Mr. Johnson's initial contact with the EEO office in March 2008.  *See e.g., Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence tending to show causation, a three-and-one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").  Here, Mr. Johnson points to no other evidence of causal connection.  Thus, the six month, eight month, and eleven month gaps are insufficient to show a causal connection.  Accordingly, with respect to the alleged retaliatory acts discussed above, *see supra* pp. 33-34, Mr. Johnson has not established a prima facie case of retaliation, and these claims fail as a matter of law.

That leaves Col. Keller's May 2008 statement that the Army does not settle with individuals who file EEO complaints against the agency as the remaining

alleged retaliatory act. The two month gap between this comment and Mr. Johnson's March 2008 complaint is sufficient to establish temporal proximity, and unlike many of the other alleged retaliatory acts, Col. Keller was directly involved because she is the individual who made the comment. Therefore, Mr. Johnson has raised an inference that Col. Keller made the statement in retaliation for Mr. Johnson's EEO complaint.

In response, the Secretary argues that there are legitimate, non-retaliatory reasons that Col. Keller made the statement. For example, Col. Keller made the statement during a budgeting discussion about a proposed settlement of an EEO claim made by an individual who the agency determined had engaged in sexual harassment of another individual in the workplace. (Doc. 44-4 at 20). Col. Keller testified that she made the statement because she believed it should not be the policy of the Army to provide severance packages to individuals the agency determined to be harassers. (Doc. 44-4 at 20). Moreover, when Col. Keller made the statement, Mr. Johnson's EEO claims had not yet been accepted for filing. (Doc. 44-4 at 21). Mr. Johnson points to no evidence from which a reasonable juror could conclude that the non-retaliatory reason for Col. Keller's statement is pretext for unlawful retaliation. (*See generally* Doc. 65). Therefore, this retaliation claim fails as a matter of law.

## III.    CONCLUSION

For the reasons explained above, the court **GRANTS** the Secretary's motion for summary judgment and **ENTERS JUDGMENT** in favor of the Secretary on all of Mr. Johnson's claims. The court will enter a separate order consistent with this memorandum opinion dismissing this case with prejudice.

**DONE** and **ORDERED** this February 22, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE